******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

DAVE GIBBS *v.* COMMISSIONER
OF CORRECTION
(AC 47995)

Cradle, C. J., and Elgo and Pellegrino, Js.

*Syllabus*

The petitioner, who previously had been convicted, after a jury trial, of capital felony, appealed following the granting of his petition for certification to appeal from the habeas court's judgment denying his petition for a writ of habeas corpus. He claimed that the court improperly concluded that his right to autonomy in deciding the fundamental objectives of his defense under the sixth amendment to the United States constitution, as established in *McCoy* v. *Louisiana* (584 U.S. 414), was not implicated under the facts of this case. *Held*:

The habeas court properly denied the petitioner's habeas petition, as the petitioner failed to establish that his trial counsel made a concession of guilt to the charged offenses during his criminal trial and that he expressly and unambiguously objected to such a concession, and, thus, *McCoy* was inapplicable to the petitioner's claim.

Argued November 18, 2025—officially released June 9, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed*.

*Lisa J. Steele*, assigned counsel, for the appellant (petitioner).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Michael Proto*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

PELLEGRINO, J. The petitioner, Dave Gibbs, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly concluded that his right to autonomy in deciding the fundamental objectives of

his defense under the sixth amendment to the United States constitution, as recognized by *McCoy* v. *Louisiana*, 584 U.S. 414, 138 S. Ct. 1500, 200 L. Ed. 2d 821 (2018), was not implicated under the facts of this case. We conclude that the petitioner failed to establish that his trial counsel made a concession of guilt to the charged offenses during his criminal trial and that he expressly and unambiguously objected to such a concession. In the absence of these threshold predicates for a *McCoy* claim, we conclude that the habeas court properly denied his habeas petition. Accordingly, we affirm the judgment of the habeas court.

On direct appeal, our Supreme Court set forth the following facts underlying the petitioner's criminal conviction. "The [petitioner], a native of Jamaica, was romantically involved with one of the victims, Tania Ramsey. Until May, 1992, the [petitioner] and Ramsey lived together in a condominium in Windsor, along with the other victim, Ramsey's mother, Carmen Fagan. Sometime in May, Ramsey went to Virginia to live with her stepsister, Tiedra Hutchings, while the [petitioner] moved in with another girlfriend, Miriam Ortega, in South Windsor.

"In December, 1991, a dispute began between the [petitioner], and Ramsey and Fagan, over the purchase price of the condominium that the three of them had been sharing. The [petitioner] told Ortega that he had purchased the condominium, and that he wanted either the title to the unit, or repayment of the $50,000 that he claimed to have contributed to the purchase price. The [petitioner] also told Ortega that if Ramsey and Fagan did not comply with his demands, he was going to get them.

"In early July, 1992, Ramsey returned to Connecticut and resumed living with Fagan at the condominium. At that time the [petitioner] told a third girlfriend, Melissa Fox, that he still was very upset with Ramsey and Fagan over the $50,000. The [petitioner] also told Fox that he was so upset with Ramsey and Fagan that he was going to strangle [Fagan] and make [Ramsey] die by suffering

slowly. The [petitioner] also stated that he was going to kill Ramsey and Fagan on July 12, and that the only way he would be happy is if [Ramsey and Fagan] were dead so that nobody could have his stuff.

"On July 10, the [petitioner] and Ortega drove to a store in Vernon, where the [petitioner] purchased an aluminum baseball bat and some rope. The [petitioner] told Ortega that the bat was for a birthday party that he planned to attend. Later that evening, Ortega overheard a telephone conversation between the [petitioner] and a person named Bobby, in which the [petitioner] stated, I gotta do what I gotta do. After the conversation ended, the [petitioner] placed the bat and the rope in a bag, and told Ortega that he was leaving for Jamaica on July 13.

"On the night of July 11, the [petitioner] went to the Windsor condominium that he had shared with Ramsey and Fagan. When he arrived, only Fagan was at home. The [petitioner] and Fagan began to argue over the money that Ramsey and Fagan purportedly owed to him. When Fagan became frightened and started to run upstairs, the [petitioner], fearful that Fagan was going to call the police, pursued her and hit her over the head with the baseball bat that he had purchased the previous day. The [petitioner] killed Fagan by striking her repeatedly over the head with the bat, until her skull was crushed and portions of her brain were exposed.

"Ramsey returned to the condominium sometime on the morning of July 12 and asked the [petitioner] where Fagan was. The [petitioner] told Ramsey that Fagan was dead, and then taunted her with a blood-soaked towel. The [petitioner] then forced Ramsey to make several telephone calls to her stepmother, Helen Hutchings, and her stepsister, Tiedra Hutchings, during the morning and early afternoon of July 12. Prompted by the distress in Ramsey's voice during the last of these telephone conversations, Helen Hutchings and Tiedra Hutchings each drove to the condominium to check on Ramsey. Before they arrived, the [petitioner] called Ortega to

tell her that he had not finished yet doing what [he] was supposed to do.

"Tiedra Hutchings, who was the first to arrive at the condominium, honked her horn several times in order to alert Ramsey to her presence. In response, Ramsey came to the second floor window and made gestures indicating that someone else was in the condominium with her. Tiedra Hutchings then asked Ramsey to leave the condominium with her, but Ramsey refused, and told Tiedra Hutchings that she would call her later.

"Concerned for Ramsey's safety, Tiedra Hutchings decided to call the police. As she was leaving to do so, Helen Hutchings arrived at the condominium, and Tiedra Hutchings told her that Ramsey was inside and in trouble. After Tiedra Hutchings and Helen Hutchings spent several minutes attempting to gain access to the condominium, Ramsey suddenly appeared at the front door, looking extremely scared and tired. When Helen Hutchings attempted to grab Ramsey's hand and pull her outside, the [petitioner] pulled Ramsey back into the condominium. The [petitioner] then took Ramsey into the upstairs bathroom, forced her to kneel in the bathtub, and slit her throat. As Ramsey continued to struggle for life, the [petitioner] stabbed her again. Ramsey subsequently died of her injuries at Hartford Hospital.

"Approximately five minutes after Ramsey had been pulled back into the condominium, the [petitioner] left carrying a duffel bag. He cursed at and insulted Tiedra Hutchings, and then walked to an automobile in the parking lot and drove away. The [petitioner] drove to the Kentucky Fried Chicken restaurant on Farmington Avenue in Hartford, where a friend, Boris Delisser, worked. The [petitioner] told Delisser that Ramsey and Fagan were dead, and that he had cut Ramsey's throat. The [petitioner] subsequently made similar statements to Ortega that included the details of both murders." (Footnotes omitted; internal quotation marks omitted.) *State v. Gibbs*, 254 Conn. 578, 581−84, 758 A.2d 327 (2000).

The petitioner was convicted of two counts of murder and one count of capital felony. Id., 580. The court rendered judgment only on the capital felony count, and the state withdrew its request for the death penalty. Id. Thereafter, the petitioner appealed his conviction to our Supreme Court; id.; which, in turn, affirmed the judgment.[1] Id., 613.

The petitioner, represented by Attorney Joseph Visone, commenced his first habeas action in 2001. The habeas court, *Bright, J.*, denied this petition, which alleged ineffective assistance of the petitioner's trial counsel, Attorneys Michael Isko and James McKay, and his appellate counsel, Attorney Martin Zeldis, and a speedy trial violation. See *Gibbs* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-01-0811179 (May 23, 2011). This court subsequently dismissed the petitioner's appeal from that decision. See *Gibbs* v. *Commissioner of Correction*, 139 Conn. App. 905, 55 A.3d 625, cert. denied, 307 Conn. 938, 56 A.3d 715 (2012).

Thereafter, the petitioner commenced the present habeas action in July 2015. His second amended petition, dated April 4, 2024, contained four counts. In count one, he alleged that his trial counsel knew that he wanted to maintain his innocence during the criminal trial and that he did not consent to counsel presenting an extreme emotional disturbance (EED) defense[2] but, nevertheless,

---

[1]In his direct appeal, the petitioner claimed that the trial court improperly (1) denied his constitutional challenge to the jury array based on the underrepresentation of Hispanic persons, (2) denied his motion for a judgment of acquittal on the capital felony count alleging that the state failed to prove beyond a reasonable doubt that the two murders took place in a single transaction, (3) denied his oral motion to dismiss the charges based on a violation of his right to a speedy trial, and (4) violated his rights under our state constitution by requiring that the jury be "death-qualified" prior to the guilt phase of the trial. *State* v. *Gibbs*, supra, 254 Conn. 580–81. Our Supreme Court rejected all of these claims. Id., 581.

[2]"The EED defense is set forth in General Statutes § 53a-54a (a), which provides in relevant part: [I]t shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of [EED] for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person

pursued that defense in violation of his constitutional right to client autonomy.[3] In count two, the petitioner alleged that his first habeas counsel provided ineffective assistance in failing to raise a claim that his constitutional right to client autonomy had been violated. In count three, he claimed that his trial counsel provided ineffective assistance of counsel by failing to allow the petitioner to maintain his innocence when they pursued an EED defense at the criminal trial. Finally, in count four, the petitioner claimed that his appellate counsel provided ineffective assistance by failing to raise a claim that his sixth amendment right to client autonomy had been violated. The respondent, the Commissioner of Correction, filed a return to the second amended petition on March 4, 2024.

The parties appeared for trial on June 7, 2024, but did not present any witnesses. The petitioner submitted the deposition of Visone, his first habeas counsel, transcripts from prior court proceedings, and other documents as exhibits. Counsel presented argument to the habeas court, *Bhatt, J.*, on July 15, 2024. Four days later, the habeas court issued a memorandum of decision denying the petition for a writ of habeas corpus.

In its memorandum of decision, the habeas court discussed the 2018 decision of the United States Supreme Court in *McCoy* v. *Louisiana*, supra, 584 U.S. 414, which

in the defendant's situation under the circumstances as the defendant believed them to be . . . . As our Supreme Court has explained, the EED defense has two elements: (1) the defendant committed the offense under the influence of [EED]; and (2) there was a reasonable explanation or excuse for the defendant's [EED]. *Jan G.* v. *Commissioner of Correction*, 237 Conn. App. 115, 122 n.4, 350 A.3d 1156 [cert. granted, 354 Conn. 930, 353 A.3d 848] (2026)." (Internal quotation marks omitted.) *Coleman* v. *Commissioner of Correction*, 238 Conn. App. 610, 613 n.3, A.3d (2026); see also *State* v. *Henderson*, 353 Conn. 433, 442–44, 342 A.3d 192 (2025); *Zachs* v. *Commissioner of Correction*, 205 Conn. App. 243, 254 n.6, 257 A.3d 423, cert. denied, 338 Conn. 909, 258 A.3d 1279 (2021).

[3]See *Leon* v. *Commissioner of Correction*, 189 Conn. App. 512, 527, 208 A.3d 296 (claimed violation of right to client autonomy is separate and distinct from one of ineffective assistance of counsel), cert. denied, 332 Conn. 909, 209 A.3d 1232 (2019).

addressed whether it is constitutional for defense counsel to concede guilt to a charged offense over a defendant's "intransigent and unambiguous objection." Id., 420. The court concluded that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." Id., 417. A defendant's autonomy to decide the objective of his defense, such as maintaining his innocence, falls within the category of decisions reserved for the client, not the attorney.[4] Id., 422. Strategic decisions, such as what arguments to pursue and what evidentiary objections to raise, remain in the lawyer's province. Id. Finally, the court noted that a violation of the right to autonomy constituted structural error.[5] Id., 427.

The habeas court noted that all of the petitioner's claims depended on establishing a *McCoy* violation, but that he had failed to prove the existence of such a violation. The court considered the deposition of the

[4]The decisions reserved for the client also include whether (1) to plead guilty, (2) to waive the right to a jury trial, (3) to testify on one's own behalf, and (4) to pursue an appeal. *McCoy* v. *Louisiana*, supra, 584 U.S. 422.

[5]The habeas court also considered whether the rule of *McCoy*, which was decided in 2018, should apply retroactively to the petitioner's case, which became final in 2000. Relying on a decision of the Superior Court that subsequently has been overturned by this court on other grounds; *Jan G.* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, Docket No. CV-18-4009648-S (November 20, 2023), rev'd on other grounds, 237 Conn. App. 115, 350 A.3d 1156 (2026), cert. granted, 354 Conn. 930, 353 A.3d 848 (2026); the habeas court concluded that *McCoy* applied retroactively to collateral proceedings, such as the instant matter.

In this appeal, the respondent argues that the habeas court improperly concluded that *McCoy* applies retroactively to this habeas action, as the direct appellate process was completed prior to May 14, 2018, the date *McCoy* was released. Specifically, the respondent argues that the rule created by the United States Supreme Court in *McCoy* was not "'dictated by precedent'" and is not a substantive or a watershed rule of criminal procedure. As a result of our conclusion that *McCoy* is inapplicable to this case, we need not reach the propriety of the habeas court's determination regarding retroactivity. See, e.g., *Grant* v. *Commissioner of Correction*, 345 Conn. 683, 686 n.2, 287 A.3d 124 (2022).

petitioner's first habeas counsel and the transcripts from the petitioner's prior criminal and habeas trials. At his first habeas trial, one of the petitioner's trial counsel testified that the petitioner did not like the EED defense and that he did not think that the petitioner wanted it, even though it was ancillary to the defense advancing "a lack of evidence to show that he caused the deaths and that he was the person that did these things."

The habeas court acknowledged that "there are comments made by [the petitioner] at the underlying criminal trial that hint at some of these issues" alleged by the petitioner in this habeas action. Ultimately, the habeas court determined that there was no evidence to support the petitioner's allegations, and therefore it could only speculate as to the nature and specifics of the disagreements between the petitioner and his trial counsel. Further, at his prior habeas trial, the petitioner did not testify that he objected vociferously to the strategy employed by his trial counsel. The court then concluded: "There is no evidence that trial counsel refused to pursue a defense of innocence; rather, the evidence is to the contrary. There is no evidence that [the petitioner] explicitly told trial counsel not to pursue an EED defense, only that he disagreed with the way the defense was proceeding. The credible evidence from [trial counsel] at the prior habeas [proceeding] establishes that counsel did pursue the defense that [the petitioner] wanted, in conjunction with setting up an EED defense for use at the guilt and penalty phases of the trial."[6] Ultimately, the habeas court concluded that all of the petitioner's claims failed because the predicate of *McCoy* had not been established. The habeas court subsequently granted the petition for certification to appeal.

As an initial matter, we set forth our well established standard of review. "Although a challenge to the facts

[6]See *Johnson* v. *Commissioner of Correction*, 229 Conn. App. 577, 590, 327 A.3d 916 (2024) (discussing defense strategy in capital cases of "'frontloading'" mitigation evidence in both guilt and penalty phases to present it twice over extended period of time to jury in effort to

found by the habeas court is reviewed under the clearly erroneous standard; see, e.g., *Duperry* v. *Solnit*, 261 Conn. 309, 335, 803 A.2d 287 (2002); whether those facts constituted a violation of the petitioner's rights under the sixth amendment is a mixed question of law and fact subject to this court's plenary review." *Grant* v. *Commissioner of Correction*, 345 Conn. 683, 694, 287 A.3d 124 (2022); see *Coleman* v. *Commissioner of Correction*, 238 Conn. App. 610, 618,     A.3d     (2026); *Jan G.* v. *Commissioner of Correction*, 237 Conn. App. 115, 125, 350 A.3d 1156, cert. granted, 354 Conn. 930, 353 A.3d 848 (2026); see also *White* v. *Commissioner of Correction*, 236 Conn. App. 67, 81, 347 A.3d 214 (2025) (in considering whether *McCoy* violation has occurred, subordinate facts found by habeas court are subject to clearly erroneous standard of review, but whether those facts constitute violation of sixth amendment right to autonomy present mixed question of law and fact that is reviewed under plenary standard), cert. granted, 354 Conn. 901, 348 A.3d 813 (2026); *John B.* v. *Commissioner of Correction*, 194 Conn. App. 767, 774, 222 A.3d 984 (2019) (mixed questions of law and fact are subject to plenary standard of review), cert. denied, 334 Conn. 919, 222 A.3d 513 (2020).

Our Supreme Court considered the applicability of a *McCoy* claim in its decision in *Grant* v. *Commissioner of Correction*, supra, 345 Conn. 683, and began its analysis with a summary of that opinion. "In *McCoy*, the United States Supreme Court recognized a criminal defendant's sixth amendment right to autonomy in deciding the objectives of his defense and concluded that the right prohibits defense counsel from admit[ting] [a] client's guilt of a charged crime over the client's intransigent objection to that admission. . . . When a client expressly asserts that the objective of his defense is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt. . . .

"'humanize'" criminal defendant), cert. denied, 351 Conn. 902, 329 A.3d 239 (2025).

"The facts in *McCoy* were not in dispute. The petitioner, Robert Leroy McCoy, was charged with three counts of first degree murder. . . . Throughout the proceedings, McCoy maintained his innocence, insisting that he was out of state at the time of the killings. . . . McCoy's defense counsel, Larry English, concluded that the evidence against McCoy was overwhelming and that, [in the absence of] a concession at the guilt stage that McCoy was the killer, a death sentence would be impossible to avoid at the penalty phase. . . .

"McCoy was furious when English told him that he intended to concede McCoy's guilt to the murders. . . . Two days before trial was set to begin, McCoy sought to terminate English's representation, and English similarly requested that the court remove him as McCoy's counsel, given their disagreement over trial strategy. . . . The trial court denied both requests . . . and, subsequently, English argued to the jury that there was no way reasonably possible that [it] could hear the prosecution's evidence and reach any other conclusion than . . . McCoy was the cause of these individuals' death[s] . . . and that the evidence is unambiguous, [McCoy] committed three murders. . . . Thereafter, McCoy took the witness stand to assert his innocence and to [press] an alibi difficult to fathom. . . . The jury found McCoy guilty on all three murder counts, and, following the penalty phase hearing, the trial court sentenced him to death in accordance with the jury's verdicts. . . . The Louisiana Supreme Court subsequently upheld the trial court's ruling that English had authority to concede McCoy's guilt, despite McCoy's opposition to any admission of guilt, concluding that [t]he concession was permissible . . . because [English] reasonably believed that admitting guilt afforded McCoy the best chance to avoid the death [penalty]. . . .

"The United States Supreme Court reversed the Louisiana Supreme Court's judgment, holding that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's [experienced based]

view is that confessing guilt offers the defendant the best chance to avoid the death penalty. . . . The court explained that, although the role of counsel necessarily entails making certain [t]rial management and strategic decisions concerning what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence, other decisions are reserved for the client alone, such as whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. . . .

"Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. . . . These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*. . . .

"In reaching its decision, the court distinguished *Florida* v. *Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004), a case involving [an ineffective assistance of counsel] claim in which the [c]ourt considered whether the [c]onstitution bars defense counsel from conceding a . . . defendant's guilt at trial when [the] defendant, informed by counsel, neither consents nor objects . . . . In *Nixon*, the court concluded that, [w]hen counsel informs [a] defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. . . .

"The court explained that the distinguishing factor between *McCoy* and *Nixon* was that, unlike the defendant in *Nixon*, who never verbally approved or protested counsel's proposed approach . . . McCoy vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt. . . . In such circumstances, the court determined, English was constitutionally obligated to honor McCoy's wish to pursue a defense of actual innocence, no matter how ill-advised or weak that defense may have been. . . . ([j]ust as a defendant may steadfastly refuse to plead guilty in

the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a . . . trial)." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Grant* v. *Commissioner of Correction*, supra, 345 Conn. 694–97.

After setting forth this summary, our Supreme Court agreed that the petitioner in *Grant* had not established that his right to autonomy was implicated in that case. Id., 697. There was an absence of any evidence credited by the habeas court that the petitioner had disagreed expressly with the strategy employed by his trial counsel. Id. Our Supreme Court explained further that the "United States Supreme Court made clear in *McCoy* that *the sixth amendment right to autonomy is implicated only when, over a defendant's express objections, counsel concedes the defendant's guilt to a charged offense*. This limitation on the right to autonomy is evident throughout the court's decision but especially in the court's restatement of the issues presented: whether it is unconstitutional to allow defense counsel to concede guilt *over the defendant's intransigent and unambiguous objection*." (Emphasis altered.) Id., 698.

In the present case, the respondent asserts that the petitioner failed to establish both aspects of a *McCoy* claim. Specifically, he contends that the petitioner failed to demonstrate that **(1)** he made an intransigent and unambiguous objection to the strategy employed by his criminal trial counsel and **(2)** the strategy employed by counsel included a concession of guilt. See id.; *White* v. *Commissioner of Correction*, supra, 236 Conn. App. 87–89. We agree with the respondent that the petitioner failed to establish that he made an intransigent and unambiguous objection to the strategy used by his trial counsel or that the use of an EED defense constituted an admission of guilt; *McCoy*, therefore, is inapplicable to the present case.

We first consider whether the habeas court properly determined that the petitioner did not make an intransigent and unambiguous objection to the strategy used by trial counsel. The petitioner argues he "made it clear that he wanted to assert his innocence and was not concerned about the penalty phase" and that the habeas court improperly concluded that he did not "vociferously object" to the strategy employed by trial counsel. We are not persuaded.

The habeas court set forth the following facts. Isko, one of the petitioner's trial counsel, testified at the petitioner's first habeas trial that he advanced two theories of defense at the criminal trial, innocence and EED.[7] He further indicated that the petitioner maintained that he was not present and did not commit the murders. Isko also stated that the petitioner had expressed his "preference" that the only defense presented to the jury was that another individual killed the two victims.[8] When asked whether the petitioner had consented or objected to the use of the EED defense, Isko testified that the petitioner "didn't like it. I don't think he wanted it and it was ancillary to what we were doing. We were advancing that there was a lack of evidence to show that he caused

[7]Specifically, Isko testified: "Well, there was a number of different theories of the case. Based on the facts—based from the facts that we had before us and the facts that we had looked at about . . . there were two basic theories of the case. One was that based on that there were no eyewitnesses to the event and based on no eyewitnesses to the event, we advanced [the petitioner's] theory [of innocence] as best we could, that there were two other suspects that carried out the assaults and the—well the homicides in the case. The other part of it was looking at the landscape of [the petitioner's] life and his interaction with these two people, that if to the extent the jury believed he was involved, he was involved in some sort of [EED] or some sort of diminished capacity. But still in all of what [the petitioner] maintained and what we advanced was that he did not cause the deaths of these two women. . . . That two other people caused the deaths . . . . [W]e advanced both [defense theories]. . . . We were not able to find witnesses to substantiate the claim of third-party culpability."

[8]Isko stated during his direct examination at the petitioner's first habeas trial that the petitioner "preferred that we went forward purely on a third-party culpability defense."

the deaths and that he was the person that did these things. But we put in the other parts of the evidence that supported the notion of what his relationship was, showing a lack of motive . . . it shows a lack of motive. Shows again a lack of motive and a lack of intent to do harm to these people, which is part of what we have to argue in any event."

The habeas court further found that, at his first habeas trial, the petitioner testified "at length" regarding his version of the events pertaining to his representation at the criminal trial,[9] "but did not testify that he objected to trial counsel pursuing an EED defense. Rather, he testified that trial counsel did not discuss much with him at all." The habeas court acknowledged that a review of the transcript from the criminal trial revealed that the petitioner made statements to the trial court suggesting his disagreement with the approach of trial counsel. For example, "on the first day of trial, [the petitioner] addressed the trial court and stated that he and trial counsel had an almost 180 degree difference in the way I think my case should be presented, which I think is very important."[10] (Internal quotation marks omitted.) The petitioner clarified to the trial court that he disagreed with his trial counsel as to certain "approaches" of his defense as well as certain "theories." The petitioner further explained that "the way [that trial counsel] want to go about it is totally different from the way I want to go about it, and I don't think they are willing to meet me halfway . . . ." (Internal quotation marks omitted.)

[9]At the outset of that proceeding, the petitioner remarked to the first habeas court: "[W]hen I first came to trial . . . I said all I want is a fair trial, which [is everybody's] constitutional right, a fair trial. Give me a defense that the constitution allow[s] me, one that [is] consistent with my plea. My lawyer [goes] with [an EED defense]. I said on the record, and if you read my record I said more than ten times . . . I'm not in agreement with the defense that's being used and my lawyer said don't worry . . . ." Later in his first habeas proceeding, the petitioner remarked that his trial counsel "wanted to go with [EED], so they weren't real . . . interested in investigating the case like it should."

[10]At that point, just prior to the start of evidence, the petitioner inquired about obtaining different counsel or proceeding in a self-represented capacity.

The trial court explained to the petitioner that his counsel was responsible for selecting the strategy for the trial. The petitioner ultimately decided "to reluctantly proceed with the representation of Attorneys Isko and McKay, while still noting that we still differ about how we should go about doing this." (Internal quotation marks omitted.) After the presentation of key witnesses, the petitioner again informed the trial court that he and counsel substantially differed as to how the trial should proceed. Specifically, he explained to the trial court that "[i]t goes to strategy, and I'm not comfortable sitting here watching them playing their strategy, which I'm thinking is fruitless not based on—because I'm not a lawyer based on what I know happened, based on my innocence in this case. Based on those things, I'm not comfortable watching them going through the motions because, Your Honor, as a judge you know that you don't come to court and just let whatever happen[s] happen." (Internal quotation marks omitted.)

The habeas court interpreted the petitioner's remarks to the trial court as appearing to be in reference to the questions asked and facts to be elicited from certain witnesses. Additionally, the habeas court noted that the petitioner later stated at his criminal trial: "I'm just expecting—I'm the defendant here, and I think I should have some say in how my trial is tried. That's all I'm asking. I'm not asking to change the law or the courtroom or anything. I'm the one on trial. I should have some form of say-so in how I'm being defended. That's all I'm asking."

After considering the record, the habeas court reached the following conclusion: "However, there is simply no evidence of what these matters were that the [petitioner and trial counsel] differed on. The court could assume as [the petitioner] suggests, but there is no evidence to do so. [The petitioner] testified at the [first] habeas [trial] but did not testify about 'vociferously objecting' to trial counsel's strategy. Indeed, he was not asked any questions on direct examination about his conversations with trial counsel at all. He also did not testify before this

court. There is no evidence that trial counsel refused to pursue a defense of innocence; rather, the evidence is to the contrary. There is no evidence that [the petitioner] explicitly told trial counsel not to pursue an EED defense, only that he disagreed with the way that the defense was proceeding. The credible evidence from Attorney Isko's testimony at the prior habeas trial establishes that counsel did pursue the defense that [the petitioner] wanted, in conjunction with setting up an EED defense for use at the guilt and penalty phases of the trial."

It is axiomatic that a habeas corpus action is a type of civil action. See *Gilchrist* v. *Commissioner of Correction*, 334 Conn. 548, 555, 223 A.3d 368 (2020); *Betancourt* v. *Commissioner of Correction*, 132 Conn. App. 806, 812, 35 A.3d 293, cert. denied, 303 Conn. 937, 36 A.3d 695 (2012). Furthermore, it is well established that the petitioner, as the plaintiff in a habeas proceeding, bears the burden of establishing grounds for relief and "cannot rely on mere conjecture or speculation . . . but must instead offer demonstrable evidence in support of his claim." (Internal quotation marks omitted.) *Owen* v. *Commissioner of Correction*, 234 Conn. App. 481, 498–99, 344 A.3d 158, cert. denied, 353 Conn. 923, 345 A.3d 812 (2025); see also *Morales* v. *Commissioner of Correction*, 99 Conn. App. 506, 509, 914 A.2d 602 (burden of establishing grounds for relief in habeas proceeding rests with petitioner), cert. denied, 282 Conn. 906, 920 A.2d 308 (2007).

In the present case, the petitioner bore the burden of establishing that he made an express, intransigent, and unambiguous objection to his counsel's use of the EED defense in conjunction with his claim of innocence. See *Grant* v. *Commissioner of Correction*, supra, 345 Conn. 698; see also *White* v. *Commissioner of Correction*, supra, 236 Conn. App. 87 (courts should strictly limit application of *McCoy* to instances in which counsel has conceded client's guilt notwithstanding client's direct, clear and unambiguous objection to such concession). Although he presented some evidence of a disagreement with his trial

counsel during the criminal proceeding, this evidence does not meet the standard mandated by *McCoy* v. *Louisiana*, supra, 584 U.S. 426, and *Grant* v. *Commissioner of Correction*, supra, 698, to establish a *McCoy* violation. As stated in the habeas court's memorandum of decision, the petitioner did not testify in the instant action, and, in his prior habeas trial he did not testify about "vociferously objecting" to the strategy employed during his criminal trial. In short, "[t]here is no evidence that [the petitioner] explicitly told trial counsel not to pursue an EED defense, only that he disagreed with the way the defense was proceeding." We conclude, therefore, that the petitioner failed to demonstrate that he specifically and unambiguously objected to the strategy employed by defense counsel. This strategy included both the EED defense and presenting evidence that the petitioner was not the person who had killed the victims. Accordingly, the habeas court properly determined that his right to autonomy was not implicated under the facts of this case.

Next, the petitioner argues that his trial counsel, by using the EED defense as part of the overall strategy, admitted or conceded his guilt during the criminal trial. The following facts are necessary in determining whether the use of the EED defense in the present case constituted an admission of guilt. In his deposition, which was admitted as an exhibit in the present matter, Visone indicated that, although trial counsel had asserted a defense of innocence, they also pursued the EED defense for mitigation purposes during sentencing. In the 2011 habeas action, the court noted the "tightrope" that trial counsel walked during the criminal trial of presenting the defense that the petitioner did not kill the victims and arguing an EED defense for mitigation purposes. During that proceeding, Isko testified that he advanced both defense theories on behalf of the petitioner. He further explained that he made the strategic decision to "lay the groundwork" to include the EED defense for the penalty phase in the event that the jury determined that

the state had proved that the petitioner was the person who killed the two victims.[11]

This court recently considered a similar claim in *Jan G.* v. *Commissioner of Correction*, supra, 237 Conn. App. 115. In that case, the respondent claimed that the habeas court improperly had concluded that counsel violated the petitioner's sixth amendment right to client autonomy as described in *McCoy* v. *Louisiana*, supra, 584 U.S. 414. *Jan G.* v. *Commissioner of Correction*, supra, 125. At the criminal trial, counsel never admitted the petitioner's guilt to the jury. Id., 128. In fact, counsel indisputably argued that the jury should find the petitioner not guilty of murder and manslaughter. Id. Counsel also stated, however, that, "on the night of the murder, the petitioner was experiencing a psychosis with delusions; voices; a sense of having to obey; and general disorganized behavior which overbore his will." (Internal quotation marks omitted.) Id. Counsel described this as a defense to the intent element of the murder charge. Id. Thus, counsel "pursued a strategy that, had it been successful, would have either led to acquittal by pursuing a not guilty verdict, or, if the jury was persuaded by the petitioner's EED defense, to a lesser sentence pursuant to a manslaughter [rather than a murder] conviction." Id.

On appeal, this court contrasted these facts to the statements of the attorney in *McCoy* that relieved the state of its burden of proof in order to avoid a death sentence for his client. Id., 128–29. We also acknowledged that the court instructed the members of the jury to consider the EED defense *only* upon a finding of guilt as to the murder charge. Id., 129. Further, we explained that, as a "bedrock" principle of criminal law, "defense counsel may pursue multiple, inconsistent defenses. . . . [Counsel] did just that by both assisting the petitioner in entering a plea of not guilty and pursuing such a theory at trial while alternatively presenting a mitigation defense of EED." (Citations omitted.) Id., 130. "*Moreover, this court has said that* [*a*] *defendant does not concede the*

---

[11]See footnote 6 of this opinion.

*elements of murder by advancing an affirmative defense of mental disease or defect, or* [*EED*]. *Zachs* v. *Commissioner of Correction*, 205 Conn. App. 243, 260, 257 A.3d 423 [cert. denied, 338 Conn. 909, 258 A.3d 1279] (2021). To conclude otherwise would suggest that raising such an affirmative defense absolves the state of its constitutional burden to establish the elements of the charged crime beyond a reasonable doubt . . . ." (Emphasis added; internal quotation marks omitted.) *Jan G.* v. *Commissioner of Correction*, 237 Conn. App. 130. Accordingly, this court concluded that *McCoy* was inapplicable to the petitioner's case, as counsel both honored his not guilty plea and did not concede his guilt. Id., 137.

Similarly, Isko pursued multiple defenses in the present case, and, in doing so, did not concede the petitioner's guilt during his criminal trial. Isko disputed and challenged the state's theory that the petitioner was the individual who killed the two victims,[12] despite what the first habeas court described as "overwhelming evidence" to the contrary. In addition, he attempted to persuade the jury that, at the time the two victims were killed, the petitioner was upset and feared "los[ing] everything," which formed the evidentiary basis for his EED defense.[13] As this court stated in *Jan G.* v. *Commissioner of Correction*, supra, 237 Conn. App. 115, this defense, if established, is predicated on a finding of the elements of murder, but operates to mitigate culpability on the basis of EED. Id., 135; see also id., 137 n.21 (EED is defense resulting in manslaughter conviction as alternative to murder, for which mitigation is fully predicated upon jury first finding that state proved all elements of murder beyond reasonable doubt).

[12]Specifically, Isko argued to the jury, inter alia, that the fingerprints taken from the bat used to kill the victims did not match the petitioner's fingerprints, that there was no proof that the petitioner brought the knife to the crime scene, and that the state's witnesses were not credible.

[13]Isko testified at the first habeas trial that, as the foundation for the EED defense, he attempted to have the jury consider the "landscape of [the petitioner's] life and his interaction with [the victims], [so] that, if to the extent the jury believed he was involved, he was involved in some sort of [EED] or some sort of diminished capacity."

Pursuant to our analysis in *Jan G.* v. *Commissioner of Correction*, supra, 237 Conn. App. 115, we conclude that *McCoy* is inapplicable because raising an EED defense does not constitute a concession of guilt that would relieve the prosecution of its burden of proof. Adhering to the principle of horizontal stare decisis,[14] that is, our commitment to follow this court's prior precedent, we conclude that trial counsel's use of the EED defense in the present case did not operate as a concession of guilt; see id., 137; *Zachs* v. *Commissioner of Correction*, supra, 205 Conn. App. 260; as required to establish a violation of the sixth amendment right to autonomy under *McCoy*. See *Baltas* v. *Commissioner of Correction*, 210 Conn. App. 167, 173–75, 269 A.3d 957 (counsel's concession during closing argument that petitioner was present at crime scene did not constitute concession of his guilt and, therefore, *McCoy* was inapplicable), cert. denied, 342 Conn. 911, 271 A.3d 1039 (2022). For these reasons, we further conclude that the habeas court properly denied the petition for a writ of habeas corpus in the present case.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[14]See *State* v. *Peeler*, 321 Conn. 375, 441, 140 A.3d 811 (2016) (*Zarella, J.*, dissenting) (stare decisis has both vertical and horizonal components, and latter refers to when court should adhere to its own earlier decisions); *State* v. *Angel A.*, 235 Conn. App. 635, 667, 346 A.3d 527 (*Moll, J.*, dissenting) (this court follows doctrine of horizontal stare decisis, i.e., commitment to follow its own precedent), cert. granted, 353 Conn. 927, 346 A.3d 512 (2025); see generally *Ramos* v. *Louisiana*, 590 U.S. 83, 124 n.5, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020) (Kavanaugh, J., concurring in part) (horizontal stare decisis refers to respect that court owes to its own precedent); *Mitschke* v. *Borromeo*, 645 S.W.3d 251, 256 (Tex. 2022) (under principles of horizontal stare decisis, three judge panels must follow materially indistinguishable decisions of earlier panels of same court unless higher authority has superseded that prior decision).